**CONNELL FOLEY LLP**
Robert K. Malone
Brett S. Theisen
Katharina Earle (*pro hac vice* forthcoming)
Kyle P. McEvilly
Amanda R. Simone
56 Livingston Avenue
Roseland, New Jersey 07068
Telephone: (973) 535-0500
Email: rmalone@connellfoley.com
　　　btheisen@connellfoley.com
　　　kearle@connellfoley.com
　　　kmcevilly@connellfoley.com
　　　asimone@connellfoley.com

*Proposed Counsel for Debtors*
*and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| In re:<br><br>EEW AMERICAN OFFSHORE STRUCTURES INC., *et al*.,[1]<br><br>　　　　　　　　Debtors. | Case No.: 26-13901 (JNP)<br><br>Chapter 11<br><br>Judge: Jerrold N. Poslusny, Jr.<br><br>(Joint Administration Requested) |

**DECLARATION OF TOM PRATT IN SUPPORT OF**
**CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

**TOM PRATT**, of full age, under penalty of perjury, hereby declares as follows:

1. I have been retained as the Chief Restructuring Officer ("CRO") of EEW American Offshore Structures Inc. ("AOS") and EEW AOS Paulsboro Urban Renewal, LLC ("URE"), the above-captioned debtors and debtors in possession (together, the "Debtors"). I am authorized to submit this declaration (the "Declaration") in support of the First Day Motions (as defined herein).

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are EEW American Offshore Structures Inc. (0270) and EEW AOS Paulsboro Urban Renewal, LLC (3844). The Debtors' mailing address is 100 Offshore Drive, Paulsboro, New Jersey 08066.

1

2.      I am a Founding Member and Managing Director of Applied Business Strategy LLC ("ABS"). I have over thirty (30) years of experience as an independent director, senior executive, receiver, expert witness, and business advisor. I have served as an independent director of distressed companies in the Oil & Gas Exploration & Production sector, Mid-Stream Oilfield Services sector, and Information Technology industry. I have also served as interim CEO of an Environmental Services company, CRO of a Residential Home Construction company, as well as President, Treasurer and Secretary of a solar panel manufacturing company.

3.      As part of my role with the Debtors, I am generally familiar with the Debtors' history, day-to-day operations, business and financial affairs and books and records, and the Debtors' restructuring efforts. Except as otherwise indicated, all facts set forth in this Declaration are based upon: (i) my personal knowledge; (ii) information supplied to me by members of management or the Debtors' professionals; (iii) my review of relevant documents; and/or (iv) my opinion based upon my experience and knowledge of the Debtors' assets, liabilities, and financials. If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

4.      On April 8, 2026 (the "Petition Date"), the Debtors each filed a voluntary petition (together, the "Petitions") for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of New Jersey (the "Court") and commenced these chapter 11 cases (these "Chapter 11 Cases").

5.      To minimize the adverse effects of filing for chapter 11 protection, the Debtors have filed several pleadings requesting various kinds of "first day" relief (collectively, the "First Day Motions") concurrently with the filing of this Declaration. I am generally familiar with the

2

contents of each First Day Motion (including the exhibits and other attachments to such motions) and, to the best of my knowledge, insofar as I have been able to ascertain after reasonable inquiry, believe the relief sought in each First Day Motion: (a) is necessary to enable the Debtors to operate in chapter 11 with minimum disruptions; (b) is critical to the Debtors' ability to maximize the value of their business; and (c) best serves the Debtors' estates and creditors' interests. Further, it is my belief that the relief sought in the First Day Motions is narrowly tailored and necessary to achieve the goals identified above.

6.       I submit this Declaration in support of the Petitions and First Day Motions, including the *Motion for Interim and Final Orders (I) Approving Postpetition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing and (VII) Granting Related Relief* (the "DIP Motion"). The relief requested in each of the First Day Motions is necessary to maximize the value of the Debtor's estate.

7.       Part I of this Declaration provides a summary overview of the Debtors' history and operations. Part II describes the circumstances surrounding the commencement of these Chapter 11 Cases. Part III describes the Debtors' capital structures and the facts in support of the DIP Motion. Part IV outlines the Debtors' First Day Motions.

## PART I

## BACKGROUND

### A.  The Debtors' Business

8.       The EEW Group (defined below) is one of the leading global manufacturers of longitudinally welded pipes, with a history dating back to 1936. Headquartered in Germany, the

EEW Group has six production facilities for steel pipes around the world. The pipes are used in a wide array of applications, primarily for the offshore wind, oil, gas and chemical industries, as well as for mechanical engineering. The EEW Group developed itself into a pioneer in the production of pipes for offshore wind foundations by adapting to the renewable energy boom at the start of the 21st century. Intent on continuing its development and expansion, the EEW Group set its sights on the United States, and in particular, New Jersey, which was experiencing a political movement to build offshore windfarms.  The EEW Group believed the American offshore wind market to be one of the most important future markets for continued growth.

9.      In October 2019, the EEW Group established AOS, which, as set forth in greater detail below, was positioned to be the primary manufacturer and distributor of monopiles for the U.S. offshore wind market, particularly for windfarms expected to be built on the New Jersey coast.  Monopiles are the steel foundations for wind turbines that can reach up to 400 feet long.

10.      In connection with New Jersey's movement for clean energy production, in June 2019, an offshore wind company headquartered in Denmark called Ørsted was selected by the New Jersey Board of Public Utilities for an offshore wind farm project ("Ocean Wind 1").  Shortly thereafter, in December 2020, New Jersey Governor Phil Murphy announced a $250 million investment into a new monopile manufacturing facility located at the Paulsboro Marine Terminal (the "PMT"), demonstrating the State's commitment to sustainable and renewable energy production.

11.      In April 2021, Ørsted and the Debtors announced that they had signed a Project Labor Agreement for the Debtors to produce the monopiles for Ocean Wind 1.  In 2022, the Debtors also entered into an agreement with Atlantic Shores Offshore Wind Project 1, LLC ("Atlantic Shores") to construct the monopiles for Atlantic Shores' offshore wind project

4

("Atlantic Shores Project 1"). At the time, Atlantic Shores Project 1 was the largest single project awarded in New Jersey and the third largest offshore wind project in the United States.

12.    To facilitate the manufacturing, storage and transportation of monopiles, with the support of third parties as discussed below, the Debtors secured a portion of the PMT, providing direct access to deepwater port infrastructure required for the shipping of monopiles for offshore windfarms.  During the development of the site at the PMT, which ultimately was never completed, the Debtors expected to create more than 200 jobs for the local community during Phase I and more than 500 jobs cumulatively during Phase II (as defined below) and were committed to building community partnerships.  These included, among other things, establishing partnerships with government stakeholders and regional educational institutions to develop curriculum and training programs that empower and grow the clean energy workforce and engaging the regional community and workforce through public information sessions and outreach to teach about career opportunities in offshore wind manufacturing.

13.    During the construction and development of the Premises (as defined below), the political and economic tailwinds shifted, and the offshore windfarms that were heavily supported and backed with substantial public and private investments came to a standstill, including the Ørsted and Atlantic Shores projects.  As such, there was no longer a near-term need for monopile production in New Jersey, which caused the Debtors to pause their immediate plans to manufacture and provide monopiles for the Atlantic coast in approximately October 2024.

14.    Since that time, the Debtors, with the support of the EEW Group, have been strategically pursuing a plan to maximize their value for all stakeholders.  Notwithstanding those good faith efforts, the Debtors have been under constant assault from their landlord, as explained

more fully below. The Debtors have filed the Chapter 11 Cases to obtain a "breathing spell" while they seek to continue marking their assets and execute a value-maximizing transaction.

B. **Corporate Organizational Structure**

15. AOS, a Delaware corporation, organized in October 2019 and headquartered in Paulsboro, New Jersey, is a subsidiary of a non-debtor German holding company, EEW AOS Holding GmbH ("AOS Holding"). AOS Holding is the sole shareholder of AOS.

16. URE, a Delaware limited liability company, organized in July 2023, and headquartered in Paulsboro, New Jersey, is a subsidiary company of AOS. On October 26, 2023, EEW AOS Paulsboro Urban Renewal, LLC, New Jersey limited liability company, merged with URE, and URE remained as the surviving entity. AOS is the sole member of URE.

17. Both AOS and URE maintain a principal address at 100 Offshore Drive, Paulsboro, New Jersey 08066. The principal assets of both AOS and URE are located in New Jersey.

18. The ultimate beneficial owners of AOS Holding also own non-debtor German entity, DiScho Vermögensverwaltung GmbH & Co. KG ("DiScho"), which is the parent company to non-debtor German entities, EEW Offshore Wind Holding GmbH & Co. KG and EEW Pipe Solutions Holding GmbH & Co. KG (collectively with AOS and URE, and the related non-debtor entities shown on **Exhibit A** hereto, the "EEW Group").

19. A chart showing the Debtors' organizational structure as of the Petition Date is attached hereto as **Exhibit A**.

6

**PART II**

**CIRCUMSTANCES GIVING RISE TO THESE CHAPTER 11 CASES**

A. **The Lease**

20.      On January 1, 2021, AOS entered into a sublease agreement (the "Sublease") with Paulsboro Waterfront Development, LLC ("PWD").[2]  Under the Sublease, AOS leases a portion of the PMT—approximately 85 acres of land in Paulsboro, New Jersey (the "Premises"). AOS intended to develop and use the Premises to manufacture, store and ship monopiles from the Premises.  The PMT, among other things, is a deep-water port facility on the Delaware River in New Jersey, which can accommodate a wide range of vessel sizes and provides access to domestic and international shipping lanes. Including all renewal options, over forty (40) years remain on the term of the Sublease.

21.      In April 2021, a Joint Site Development Agreement was executed by and among AOS, Gloucester County Improvement Authority, South Jersey Port Corporation, and Ocean Wind LLC to develop the Premises in two phases. Phase I began in 2021 and entailed approximately $110 million in capital infrastructure investments to construct a welding building, painting facilities, material handling systems, and essential roll-on/roll-off wharf infrastructure, including associated equipment purchases. Phase I was completed in 2023, financed by EEW and Ørsted as part of their local content commitment.

22.      Phase II development began in early 2023 but was never completed due to economic and political changes beyond the Debtors' control. On October 31, 2023, Ørsted announced that following a decision by its Board of Directors, Ørsted would cease development

---

[2] On July 21, 2023, AOS and URE executed an *Assignment and Assumption of Sublease* pursuant to which AOS assigned, transferred, and set over unto URE all of AOS' right, title and interest in, under and to the Sublease, and all of AOS' liabilities and obligations under the Sublease.

on Ocean Wind 1 due in part to high inflation, rising interest rates, and supply chain constraints. In early 2025, the EPA pulled back Atlantic Shores' fully executed air permit, thereby impeding Atlantic Shores' regulatory approvals. Due to the cancelation of the plans to build windfarms near New Jersey, which originally caused the Debtors and others to invest in the development of the PMT, the further development of the Premises was not currently feasible.

23. If Phase II of development had been completed, the Premises would have contained the first fully integrated monopile manufacturing plant in the United States, capable of producing 100 monopiles annually, which would have substantially reduced reliance on imported European monopiles. Despite the disruption in demand for monopile production for the Premises, the Debtors have complied with all the express and implied terms of the Sublease as they explore strategic alternatives or a suitable sub-tenant.

**B. The Prepetition Marketing Process**

24. Once it became clear that the production and distribution of monopiles would be disrupted at the Premises, the Debtors decided to explore alternative uses for the Premises under the Sublease. As indicated, the Premises is uniquely suited for heavy industrial operations and includes direct vessel access to the Atlantic Ocean via two dedicated deep-water heavy-load wharves and on-site materials for immediate construction of two state- and locally-approved buildings. Throughout 2025, the Debtors attempted to find beneficial and profitable uses for the Premises that complied with the terms of the Sublease.

25. To accomplish this goal, the Debtors engaged Hilco Corporate Finance, LLC ("Hilco") to market the Premises and facilitate a sublease or other arrangement for a third party to take control of the Premises. Hilco's outreach focused on parties that would be a strategic fit for the Debtors' assets and is leveraging its geopolitical group to engage the Office of Strategic Capital

within the Department of Defense to present the Premises as a strategic opportunity. The Debtors'

prepetition marketing process included outreach to 237 prospective buyers.  Multiple parties have

entered into non-disclosure agreements with the Debtors, and the marketing process remains

ongoing.

### C. The Litigation

26.    On October 7, 2025, the Debtors' landlord, PWD, commenced state court

proceedings in the New Jersey Superior Court against URE (the "Sublease Litigation").

27.    In the Sublease Litigation, PWD is asking that the court order URE to vacate the

Premises for certain alleged events of default under the terms of the Sublease and return possession

of the Premises to PWD. Some of these alleged events of default simply do not constitute a basis

for terminating the Sublease while others appear to be plainly fabricated by PWD in an attempt to

terminate the Sublease and interfere with the Debtors' business. Notably, the alleged defaults

consist entirely of covenant defaults, not monetary defaults. URE never missed a rent payment or

other monetary obligation under the Sublease,[3] although URE elected to withhold the most recent

quarterly rent due six (6) days ago on April 1, 2026, which payment is entitled to a ten (10) day

cure period under the Sublease and now stayed by the filing of the Debtors' voluntary petitions.

28.    PWD argues that the sole permissible use of the Premises under the Sublease is the

production and distribution of monopiles, and because the Debtors are not producing monopiles,

URE is in default and its rights under the Sublease are terminated.

29.    Through no fault of the Debtors, the demands and investments in monopile and the

wind turbine industry have receded. It is no longer feasible for the Debtors to continue investing

---

[3] PWD has argued that it is entitled to holdover rent from URE as a result of the alleged covenant breaches, which PWD alleges resulted in termination of the Sublease.  The Debtors vehemently disagree.

valuable time and resources into using the Premises for monopile construction. Instead, the Debtors have shifted their focus to marketing the most valuable asset they have—the Sublease.

30.     Despite PWD's assertions that the only permissible use for the Sublease is for the monopiles, the permissible use under the Sublease more broadly allows for the manufacture of iron and steel products. Furthermore, the Sublease permits another use or purpose of the Premises if such use or purpose is approved by PWD in advance in writing, and that such approval by PWD shall not be unreasonably withheld, conditioned or denied.

31.     As early as January 2025, the Debtors made PWD aware that the Debtors were marketing the Sublease to find an alternative use for PWD's approval. Instead of working with the Debtors to find a workable and profitable solution for all parties, PWD has chosen to manufacture alleged events of default by URE, disrupt the Debtors' marketing efforts, interfere with potentially interested parties to dissuade their interests in the Sublease, and abridge the Debtors' contractual rights under the terms of the Sublease.

32.     In the Sublease Litigation, URE has asserted counterclaims against PWD, including breach of contract, declaratory judgment, breach of the covenant of good faith and fair dealing, and tortious interference (collectively, the "Counterclaims").  In sum, and as described in part below, PWD's baseless claims against URE interfered with the Debtors negotiations to monetize the Sublease, which caused the Debtors to suffer from damages in an amount of not less than $50 million.

33.     The Sublease Litigation is only in the beginning stages of discovery, and contemporaneously with the filing of the Petitions, URE has filed a Notice of Removal of the Sublease Litigation to this Court.

### D. **The Prospective Owner**

34.     On December 30, 2025, AOS informed PWD that AOS had entered into an agreement for a third party (the "Prospective Owner")[4] to acquire AOS's membership interest in URE and take over operations of the Premises (the "Acquisition Agreement").

35.     The Prospective Owner is a well-established U.S. based maritime construction company and subsidiary of a global parent corporation, both with long track records of success in the maritime industry. The Prospective Owner already has a major operational base in the U.S. with plans to invest another $5 billion to expand regionally and increase its production capacity. The Prospective Owner is primarily focused on high-tech naval defenses for the United States Navy.

36.     Under the Acquisition Agreement, the Prospective Owner would be able to revitalize the terminal, drive cargo volumes, and create jobs both on the Premises and in the region. The anticipated use of the Premises under the Acquisition Agreement would also allow the Borough of Paulsboro to continue to obtain PILOT payments related to the Premises. All parties, including PWD, would benefit from the financial and practical impacts generated by the Acquisition Agreement. Based upon the foregoing, a reasonable party would permit such use of the Premises by the Prospective Owner as universally beneficial.  Due to the ongoing Sublease Litigation and PWD's interference with the Acquisition Agreement, however, the Prospective Owner walked away from the Acquisition Agreement on March 3, 2026. Following the Prospective Owner's decision to abandon the Acquisition Agreement, the Debtors and Hilco restarted their marketing process for the Sublease and began preparations to do so under the protections of Chapter 11.

---

[4] PWD is aware of the identity of the third-party. Due to confidentiality requirements, the name of the party is not being publicly disclosed in this First Day Declaration.

# PART III

## CAPITAL STRUCTURE AND DIP MOTION

### A. Pre-Petition Capital Structure

#### i.    Secured Indebtedness

37.    As of the Petition Date, the Debtors have approximately $9,675,873.83 million in total outstanding funded secured debt obligations. The following table depicts the Debtors' prepetition secured financing:

| DEBTOR FINANCING FACILITIES | | |
|---|---|---|
| **Facility** | **Maturity** | **Amount Outstanding[5]** |
| Secured Promissory Note and Security Agreement, dated March 20, 2026 | December 31, 2026 | $900,857.01 |
| Intercompany Term Loan Agreement, dated February 26, 2026 | December 31, 2026 | $230,882.19 |
| Intercompany Term Loan Agreement, dated December 10, 2025 | December 31, 2026 | $2,041,600.10 |
| Intercompany Term Loan Agreement, dated September 22, 2025 | December 31, 2026 | $1,770,394.01 |
| Intercompany Term Loan Agreement, dated July 1, 2025 | December 31, 2026 | $2,686,255.66 |
| Intercompany Term Loan Agreement, dated June 20, 2025 | December 31, 2026 | $835,723.98 |
| Intercompany Term Loan Agreement, dated March 19, 2025 | December 31, 2026 | $1,210,160.83 |
| **Total Funded Secured Debt:** | | **$9,675,873.83** |

38.    On March 20, 2026, the Debtors and DiScho entered into a *Secured Promissory Note and Security Agreement*, with a total principal balance of up to $2.6 million.  The Prepetition

---

[5] The approximate balances set forth herein are as of March 31, 2026. The obligations under the Prepetition Debt Documents are denominated in Euros and were converted into U.S. Dollars using the Euro/U.S. Dollar exchange rate as of April 1, 2026.  For the avoidance of doubt and notwithstanding anything to the contrary herein, (i) upon the entry of the Interim Order, $3.25 million of the obligations under the Prepetition Debt Documents shall be deemed rolled-up and a cashless Advance under the DIP Credit Agreement and (ii) upon the entry of the Final Order, all remaining obligations under the Prepetition Debt Documents shall be deemed rolled-up and a cashless Advance under the DIP Credit Agreement.

Secured Note was effectively a bridge-loan to provide the Debtors with the necessary liquidity to satisfy current operating expenses and prepare for the Chapter 11 Cases. As of the Petition Date, the outstanding balance under the Prepetition Secured Note was approximately $900,857.05.

39.     On each of the dates set forth above, the Debtors and the Prepetition Secured Lender entered into an *Intercompany Term Loan Agreement*. As of the Petition Date, the collective outstanding balance under the Prepetition Intercompany Loans was approximately $8,775,016.78.

### ii.    Unsecured Indebtedness

40.     In the ordinary course of business, the Debtors incur unsecured indebtedness to taxing authorities, landlord, utility providers, and service providers, among others. As of the Petition Date, the Debtors' estimated outstanding unsecured indebtedness is approximately $12 million.

### B.  The DIP Facility[6]

41.     Since my retention as CRO, I became involved in assessing and evaluating the Debtors' business situation and finances and working with the Debtors to develop strategies in light of their current financial circumstances. The Debtors' financial situation is such that they do not have any reserve funds or expectation of receiving receipts in any meaningful amounts. Additionally, given that the Debtors lack any meaningful revenue sources in the near term, it is not possible for them to operate utilizing cash collateral only, rendering post-petition financing a necessity.

42.     The proposed DIP Facility constitutes a below market financing proposal as reflected, among other things, in the lower than customary interest rates and absence of borrowing fees. The Debtors require immediate access to the DIP Facility and continued use of Cash

---

[6] Capitalized terms used in this Section III.B. and not otherwise defined in this First Day Declaration shall have the meaning ascribed to them in the DIP Motion.

Collateral to operate their enterprise and implement a value-maximizing sale transaction. Absent the liquidity infusion to be provided by the DIP Facility, the Debtors would experience significant value-destructive consequences, notably the inability to continue prosecution of the Counterclaims (as defined below) in tandem with the continuation of the marketing and sale process for the Sublease.

43.    The DIP Documents are the result of: (a) the Debtors' determination that under the current circumstances, and given the lack of any other alternatives, the DIP Facility offered by the DIP Lender provided the best and, in fact, only postpetition financing alternative available to the Debtors and (b) negotiated, arm's length, good-faith negotiations between the Debtors and the DIP Lender.  To ensure good faith and arm's length negotiations between the Debtors and the DIP Lender, DiScho designated Heiko Grebe and Christian Berghoff, who are charged with the responsibility and authority to negotiate the terms of the DIP Facility on behalf of DiScho.

44.    The Debtors have been engaging in negotiations with the proposed DIP Lender for approximately two (2) weeks regarding the funding needs and loan terms to arrive at a proposal that is economically beneficial to the Debtors.  During this time, I have assisted the Debtors in developing a 13-week operating budget to project the Debtors' minimal financial requirements. This process involved me analyzing the Debtors' cash needs and their critical operations and the expenses of these operations. Based on that analysis and my discussions with the Debtors and the EEW Group, I determined that the Debtors needed to raise at least $6.5 million to file chapter 11 proceedings, establish a bid and sale process, and to file and confirm a Plan.

45.    The best option for the Debtors was to move forward with the proposal by the DIP Lender given the Company's acute liquidity need and the lack of alternative proposals.  Further, in my experience no third party would be willing to provide postpetition financing on better terms

14

(including on an unsecured basis) given the circumstances of these Chapter 11 Cases, and it was not feasible to spend either time or additional resources seeking out or negotiating competing proposals for postpetition financing. The Debtors' cash and time constraints prior to the Petition Date did not allow the Debtors to fund a marketing process for alternative debtor in possession financing.

46.     The Debtors' cash-on-hand will not be sufficient to fund operations as a going concern without the proceeds from the DIP Facility.  The DIP Facility will provide the Debtors with sufficient liquidity to stabilize their business and fund the administration of these Chapter 11 Cases as the Debtors seek to proceed expeditiously toward a value-maximizing sale transaction. The DIP Facility will also provide the Debtors with the necessary liquidity to fund their business operations during these Chapter 11 Cases and maintain relationships with stakeholders. Consequently, the DIP Facility is necessary to preserve the value of the Debtors' estates.

## PART IV

### SUMMARY OF FIRST DAY MOTIONS

47.     To minimize the adverse effects of commencement of these Chapter 11 Cases on the Debtors' business and asset values, the Debtors request a variety of relief in the First Day Motions filed contemporaneously herewith. I am familiar with the contents of each of the First Day Motions, and to the best of my knowledge, information, and belief, the facts set forth therein are true and correct. I believe that the relief sought therein is necessary to permit an effective transition into chapter 11 and to therefore preserve and maximize value of the Debtors' estates for the benefit of the Debtors' stakeholders. The relief requested in connection with the First Day Motions is also narrowly tailored so as to only seek such relief the Debtors believe is necessary to

avoid immediate and irreparable harm to the Debtors' estates.  Specifically, the Debtors seek approval of the following First Day Motions:

**A. Debtors' Motion for Entry of an Order (I) Directing Joint Administration of the Chapter 11 Cases and (II) Granting Related Relief (the "Joint Administration Motion").**

48.     Given the integrated nature of the Debtors' operations, joint administration of these Chapter 11 Cases for procedural purposes only will provide significant administrative convenience without harming the substantive rights of any party in interest. Many of the motions, hearings, and orders in these Chapter 11 Cases will affect each Debtor entity. The entry of an order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings, objections, or multiple hearings on common issues. Joint administration also will allow the Office of the United States Trustee for the District of New Jersey (the "U.S. Trustee") and all parties in interest to monitor these Chapter 11 Cases with greater ease and efficiency.

49.     Moreover, joint administration will not adversely affect the Debtors' respective constituencies because the Joint Administration Motion seeks only administrative, not substantive, consolidation of the Debtors' estates. I believe that parties in interest will not be harmed by the relief requested; instead, parties in interest will benefit from the cost reductions associated with the joint administration of these chapter 11 cases. I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest

**B. Motion for Entry of an Order (I) Extending Debtors' Time to File Schedules and Statements and (II) Granting Related Relief (the "Schedules and SOFAs Motion").**

50.     Pursuant to the Schedules and SOFAs Motion, the Debtors seek entry of an order (i) extending the deadline by which the Debtors must file (a) their schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial

affairs (collectively, the "Schedules and Statements") by fourteen days, for a total of twenty-eight (28) days from the Petition Date, to and including May 6, 2026, without prejudice to the Debtors' ability to request additional extensions for cause shown. I believe that good and sufficient cause exists for granting an extension of time to file the Schedules and Statements. The ordinary course of the Debtors' business requires the Debtors to maintain books, records, and accounting systems. Collecting the necessary information requires an expenditure of time and effort on the part of the Debtors and their professional advisors in the near term.

51. In the days leading up to the Petition Date, the Debtors' primary focus has been preparing for the chapter 11 filing, preparing the business to transition into chapter 11, and negotiating with the DIP Lender for a proposed debtor-in-possession financing facility. The Debtors intend to refocus the attention of key personnel to compliance with chapter 11 obligations during the early days of these Chapter 11 Cases. Moreover, an extension will not harm creditors or other parties in interest because, even under the extended deadline, the Debtors will file the Schedules and Statements in advance of any deadline for filing proofs of claim in these Chapter 11 Cases. I believe that the relief requested in the Schedules and SOFAs Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest.

**C. Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to File a Consolidated Creditor Matrix and List of Top Twenty Creditors and (II) Granting Related Relief (the "Creditor Matrix Motion").**

52. The Debtors request authority to file a single list of their 20 largest general unsecured creditors on a consolidated basis (the "Consolidated Top 20 List"). Because the top creditor lists for each individual Debtor could overlap, and certain Debtors may have fewer than 20 significant unsecured creditors, the Debtors submit that filing separate lists for each Debtor would be of limited utility and would require an unnecessary expenditure of finite time and

17

resources. Preparing and maintaining a separate creditor matrix for each Debtor would be similarly time consuming and administratively burdensome. The Debtors believe that authorizing the Debtors to maintain and file a consolidated list of creditors (the "Consolidated Creditor Matrix") is warranted under the circumstances. I believe that filing a Consolidated Top 20 List and a Consolidated Creditor Matrix is necessary for the efficient and orderly administration of these Chapter 11 Cases, appropriate under the facts and circumstances, and in the best interest of the Debtors' estates.

**D. Debtors' Motion for Interim and Final Orders (I) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Service, (II) Deeming Utilities Adequately Assured of Future Performance, (III) Establishing Procedures for Resolving Requests for Additional or Different Adequate Assurance of Payment, (IV) Scheduling a Final Hearing and (V) Granting Related Relief (the "Utility Motion").**

53.     In connection with the operation of their business and management of their leased property, the Debtors incur utility expenses in the ordinary course of business for, among other things, electricity, natural gas, water, trash collection and telephone and telecommunication services (collectively, the "Utility Services") through approximately 6 accounts that they have with various utility companies and other providers (each a "Utility Provider" and, collectively, the "Utility Providers"). The Debtors typically process invoices from, and make payment on account of such invoices to, most of the Utility Providers on a monthly basis.  A schedule of the Debtors' specific Utility Providers and the deposit held by each Utility Provider, if any, is set forth on Exhibit A to the Utility Motion.

54.     Additionally, the Debtors seek to establish reasonable procedures (the "Adequate Assurance Procedures") by which a Utility Provider may request additional adequate assurance of future payment, in the event that such Utility Provider believes that its Utility Deposit does not provide it with satisfactory adequate assurance. I submit that the Debtors' proposed Adequate

Assurance Procedures will provide a streamlined process for Utility Providers to address potential concerns with respect to the proposed adequate assurance.

55.     The Debtors intend to satisfy postpetition obligations owed to the Utility Providers in the ordinary course of business and in a timely manner. In the event any of the Utility Providers alter, refuse, or discontinue service, even for a brief period, it will cause a substantial disruption to the Debtors' efforts to conduct an orderly sale process. Any loss of utility service could result in immediate and irreparable harm to the Debtors. Therefore, I believe that the relief requested in the Utilities Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest.

**E. Debtors' Motion for Interim and Final Orders (I) Authorizing the Debtors to Continue and Maintain Their Existing Bank Accounts, Cash Management System and Business Forms, (II) Continue to Perform Intercompany Transactions, (III) Modifying the Investment Guidelines, (IV) Scheduling a Final Hearing and (V) Granting Related Relief (the "Cash Management Motion").**

56.     In the ordinary course of business, the Debtors utilize and maintain a centralized cash management system (as described herein, the "Cash Management System"), to collect, manage, and disburse funds used in their operations. The Cash Management System is essential to the efficient execution and achievement of the Debtors' business, and to maximizing the value of their estates. Any disruption to the Cash Management System would have an immediate and adverse effect on the Debtors' business and operations, to the detriment of their estates and stakeholders.

57.     To minimize the disruption caused by these Chapter 11 Cases, the Debtors request authority to continue to use their existing Cash Management System during the pendency of these Chapter 11 Cases, including (i) continuing to use their existing bank accounts and business forms, (ii) performing intercompany transactions in the ordinary course of business, (iii) modifying the

19

investment guidelines set forth in section 345 of the Bankruptcy Code, subject to the terms

described in the Cash Management Motion, and (iv) providing the U.S. Trustee with a sixty (60)

day objection period.  I believe that the relief requested in the Cash Management Motion is in the

best interests of the Debtors' estates, their creditors, and other parties in interest.

**F. Debtors' Motion for Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing and (VII) Granting Related Relief.[7]**

## CONCLUSION

58.     The Debtors' ultimate goal in these Chapter 11 Cases is to consummate a value-

maximizing transaction for the benefit of all of their creditors. In the near term, however, to

minimize any loss of value of their business or assets during this time, the Debtors' immediate

objective is to maintain a business-as-usual atmosphere during the pendency of these Chapter 11

11 Cases, with as little interruption or disruption to as possible. I believe that if the Court grants

the relief requested in each of the First Day Motions, the prospect of achieving the Debtors'

objectives will be substantially enhanced.

I declare under penalty of perjury that the foregoing is true and correct.


Executed on: April 9, 2026                                    */s/ Tom Pratt*
                                                              Tom Pratt

---

[7] The DIP Motion's requested relief and factual foundation is set forth in Section III.B.

20